JOHN C. COURTNEY, ESQ.
Nevada Bar No. 11092
CHRISTOPHER L. BLAKESLEY, ESQ.
Nevada Bar No. 11922
LUCHERINI BLAKESLEY COURTNEY, P.C.
3215 W. Charleston Blvd., Ste. 120
Las Vegas, Nevada 89102
Ph.: (702) 608-3030
Fax: (702) 534-6354
info@lbclawgroup.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| SAGAR NAVIN PATEL,<br><br>Plaintiff<br><br>v.<br><br>OFFICER BOE D. DENNETT; DOES I through V, inclusive; and ROE CORPORATIONS VI through X, inclusive,<br><br>Defendants. | Case No.: 2:16-cv-00730-JAD-PAL |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**(ORAL ARGUMENT REQUESTED)**

COMES NOW, Plaintiff, SAGAR NAVIN PATEL, by and through his counsel of record, Lucherini Blakesley Courtney, P.C., and hereby files his Opposition to Defendants' Motion for Summary Judgement.  Plaintiff's Opposition is made and based on the following Memorandum of Points and Authority, all pleadings and papers on file herein and any oral argument this Court may allow.

. . .

. . .

. . .

1

1
2

## MEMORANDUM OF POINTS AND AUTHORITY

3

### I.   INTRODUCTION.

4

5          As is described in the Complaint in this case, this is a case about the violation of the First

6   and Fourth Amendment rights of Plaintiff Sagar Patel.  Mr. Patel was visiting Las Vegas on April

7   5, 2014, when he was subjected to a racial slur by a Las Vegas police officer followed by the use

8   of excessive force - including the bending of his left arm until the upper portion of it snapped,

9   breaking in three places.  Mr. Patel had never had any problem with the police before, except for a

10  stop sign violation.  He is Indian/American, born and raised in the United States and is a graduate

11  of the University of California, Davis.  There are sharp disagreements about the genuine issues of

12  material facts in this case that preclude summary judgement.  In addition, there is no basis in law

13  for summary judgment either as Officer Dennett, the police officer who broke Mr. Patel's arm,

14  lacked probable cause to even grab Mr. Patel, much less use excessive force breaking his arm.

15  Further, the law is clearly established with respect to the First and Fourth Amendment issues

16  presented in this case so that qualified immunity does not apply.  Defendants' Motion should be

17  denied.

18

19  ### II.   STATEMENT OF FACTS.

20          Sagar Patel was walking down Paradise Boulevard, about 50 yards from the intersection of

21  Paradise and Twain, in Las Vegas at around midnight on April 5, 2014.  This is a very loud

22  intersection with very high volumes of traffic and regular fly-overs of large commercial airplanes

23  and helicopters.  Paradise is a few blocks from the main strip.  At the time of the subject incident

24  in this case, the only persons in the direct vicinity (except those passing by in motor vehicles) were

25  Mr. Patel, his five friends, and police officers.  He consumed an adult beverage earlier in the

26  evening, but it had been awhile since then and he was not drunk.  Mr. Patel and his friends had just

27  left a Japanese restaurant.  After considering eating there, they decided they did not want that food,

28

1    and went on to look for another spot.

2            Two of his friends were walking close to Mr. Patel, and three others were approximately

3    15-20 feet ahead of him. (Deposition of Sagar Patel, pg. 61, ll. 6-8, attached as Exhibit A to

4    Defendants' Motion for Summary Judgment, hereafter "Exhibit "1" pg. 61, ll. 6-8"). Mr. Patel was

5    on the sidewalk. (Exhibit "1" pg. 93, ll. 11-14). Frustrated that they could not find food, and feeling

6    very hungry, Mr. Patel said in a raised voice so that those in front could hear something like "Why

7    isn't there any good food in this Fuckin Place"? (Complaint, para. 7). He made this comment for

8    his friends. There were not other people near him and his friends on that late night. Also, they

9    were in a commercial district and there were no homes close to where they were walking, and the

10   area was consumed by loud traffic noise. The apartments in the vicinity were a considerable

11   distance away, more than 500 feet from the place of the incident. (See the Affidavit of Travis Hesse

12   which provides additional facts regarding the locale of the apartments in relation to the subject

13   incident. Exhibit "2"). The location of the subject incident, along with all of its usual noise, should

14   be the subject of a jury site visit, not the subject of summary judgment, because whether or not Mr.

15   Patel was so loud in a commercial area as to disturb the peace is a question of fact for the jury.

16           Unknown to Mr. Patel, there was a Las Vegas patrol car nearby with two officers in it when

17   he made this remark, Officer Dennett and Officer Smith. Officer Dennett heard what Mr. Patel had

18   said, and said to Mr. Patel through an open window "why don't you go back to where you came

19   from." (Exhibit "1" pg. 62, ll. 3-5.) While the officer said that he instructed Mr. Patel and his

20   friends to merely leave the area, the verbal exchange – whatever was said – unequivocally

21   demonstrates that even the officer did not believe at that point in time that Mr. Patel had done

22   anything yet to warrant arrest.

23           Mr. Patel is an Indian/American with-dark skin. His friends are also Indian/American with

24   dark skin. He has never been involved in any brawls, or studied any type of martial arts. He

3

graduated from the University of California Davis, with a degree in economics.  He was employed full-time at the time with a firm in the East Bay handling payroll operations.

Mr. Patel was stunned by the racial content of what was said, as well as the clear derogatory intonation that he heard accompanying the comment. (Exhibit "1" pg. 148, ll. 9-17.)  Given that he was born and raised in the U.S., and was much of an American as the officer, he responded "Fuck you, I'm an American" to officer Dennett and gave him the middle finger.  This is *actually* what caused the incident to take place.  Indeed, Mr. Patel did not disturb the peace at all; instead, Mr. Patel disturbed the wrong peace officer, one who would break his arm in multiple places leaving Mr. Patel's arm mangled for the remainder of his life.

Officers Smith and Dennett then immediately pulled their car over to the curb, and Officer Dennett quickly got out and walked straight for Mr. Patel.  There was no break where Officer Dennett attempted to talk with Mr. Patel, or investigate – he simply proceeded straight toward Mr. Patel, who is only 5'7" tall.  Officer Dennett is 6' 1" and weighs 210-230 pounds.[1]  Officer Dennett had his club, his gun, and no reason to fear for his safety from Mr. Patel who was extremely scared, and immediately put his hands up in the air with his palms facing out saying "I'm sorry I'm sorry" as he saw Officer Dennett with an angry expression coming at him.

Mr. Patel never "bladed off."  He does not even know how to "blade off" and was so frightened that he did the opposite.  He put up his arms in a conciliatory manner and apologized repeatedly.  Officer Dennett, still angry about what it happened, quickly grabbed Mr. Patel by his left arm and marched him over to the patrol car pushing him up against the car.  As he pushed Mr. Patel against the car, Officer Dennett continued to exert force on Mr. Patel's left arm and told him to "stop resisting" to which Mr. Patel was surprised because he was doing anything but resisting.

---

[1] Officer Smith testified under oath that Mr. Patel was practically half the size of Officer Dennett. Exhibit "3", pg. 26, ll. 8-10.

4

He responded, "I'm not resisting." Officer Dennett ignored him and continued to exert great, painful pressure to Mr. Patel's arm until there was a loud "pop" in Mr. Patel's left arm, that both he and Officer Dennett heard as the bones in his arm broke in three places causing a terrible compound fracture. (See x-ray photograph of breaks attached as Exhibit "4").

Mr. Patel said "you broke my arm, I can't believe you broke my arm" and then was then lowered to the ground until an ambulance came and took him to the hospital.  He returned to the Bay Area for treatment by Kaiser and received medical care over many months.  His arm has recovered much of its strength, but at times he still feels pain, and there is a permanent bow in his arm that is visible when looking at it.

## III.    STANDARD OF REVIEW.

Defendants accurately state the standard of review with one glaring exception: for purposes of review of this motion, the facts stated in the Complaint *and* testified to under oath at deposition must be presumed to be true at this juncture.  Defendants seem to think that they can emphatically state the facts as they see them, and make character assessments such as "...he (Mr. Patel) is not a good witness for what actually caused [his upper-arm] to break [into multiple pieces]," and this Court will just accept their representations as fact for the purposes of summary adjudication.  That is not a proper standard of review.  Almost every fact in this case is in dispute, and summary judgment is not the appropriate means to decide questions of fact.

## IV.    LEGAL ARGUMENT.

### A.    Genuine Issues of Material Fact Preclude Summary Judgement.

Genuine issues of material fact preclude summary judgment.  Defendants state numerous issues of fact as if they are given truths and a review of a some of them is sufficient for this Court to deny this Motion as these disputed issues preclude Summary Judgment.

Starting from the beginning Defendants expect this Court to assume their inaccurate view

of the facts.  Officer Dennett starts off by saying that he "first observed Patel as he attempted to enter a closed business." (Defs. Brief at pg. 4, ll. 14-15).  Mr. Patel testified that this never happened (Exhibit "1", pg. 57, ll. 1-3.).  Officer Smith did not see this happen: (Deposition of Officer Smith, attached to Defendants' Motion for Summary Judgment Exhibit D, hereafter "Exhibit "3" pg. 26, ll. 1-25").  Officer Smith Q: "Did you see him close to any businesses, trying to open any doors? A: "No" (Exhibit "3" pg. 22, ll. 19-22).

Defendant Dennett is twisting facts to try to make Mr. Patel look bad by accusing him of things he did not do.  As another example, Defs. brief says that Officer Smith testified that Mr. Patel left the sidewalk (Defs. brief pg. 6, ft. 6) but they leave out that on the deposition page before that Smith testified "I would say that he (Patel) was always on the sidewalk." (Exhibit "3" pg. 22, ll. 19).  Inconsistencies like this are precisely why issues of fact are left to be resolved at trial, not on Motion papers.

And the inconsistencies continue.  With respect to the first words said by Officer Dennett, Mr. Patel and his cousin, Kamal Patel both testified that Dennett said, "Why don't you go back to where you came from." (Exhibit "1", pg. 62, lns. 3-5.) (Depo. of Kamal Patel pg. 26, lns. 22-23 Q: Do you remember what – what he said?  A: "He said "Go back to where you came from."  According to Defs. brief Dennett "told Patel he had too much to drink and go home." (Defs. brief pg. 2, ln. 16).  In fact, Dennett said nothing about drinking, and rudely suggested that Mr. Patel "go back to where you came from."  Again, a genuine issue for the jury to decide.

Mr. Patel's response to being told to "go back to where you came from" raises yet another issue of fact.  Defendants repeatedly tell this Court that Mr. Patel responded "Fuck you," but  they leave out the entirety of the sentence.  Feeling disrespected and the subject of unlawful discrimination, Mr. Patel said "Fuck you, I'm an American."  Officer Dennett testified that he recalled hearing Mr. Patel say that he was "American." (Dennett Deposition, attached to Defs' brief

as Exhibit C, pg. 12, lns. 13-15.) Q: Did you recall him saying "I'm an American." A: I know that sometime during our interaction he did use those words, yes sir." This is more than nuance. A jury may well find that this response reflects a reaction to a racist comment. A response by an American citizen, born and raised.

It is not only the words that raise a genuine issue, it is the actions. When first asked in a Request for Admissions to admit that Mr. Patel had given him the finger before he got out of the car and approached Mr. Patel, Officer Dennett admitted that Mr. Patel had given him the finger. Then, just before his deposition started, Officer Dennett said that he was going to change his admission and testify that Mr. Patel never gave him the finger, which he did in deposition. (Exhibit "5", pg. 7. ll. 13-22 Q: Okay. And so as you sit here today, you have no recollection of Mr. Patel ever giving you the middle finger? A: "No, Sir." The day after this change in testimony by Officer Dennett his partner in the car, Officer Smith, testified that he clearly saw Mr. Patel give them the finger (Exhibit "3", pg. 19, ll. 17-20 Q: "What kind of things did you see that caused you to believe that he had escalated?" A: "He flipped us off with two middle fingers and said 'fuck you.'" pg. 20.

A jury may well find that Officer Dennett changed his testimony from the truth because it reflected on why he became angry, responded abruptly out of anger, and then broke Sagar's arm in his anger. Again, Mr. Patel did not disturb the peace, he disturbed a peace officer with Constitutionally-protected free speech.

The inconsistencies then go from what was said to what physically happened. The Defendants claim that Officer Dennett "stepped out of the car and told Patel to come over to the patrol car." (Defs. brief pg. 6, ll. 8). To their credit, they admit to a issue of fact by dropping a footnote saying that Mr. Patel testified that Officer Dennett did not give any command, but just went straight over to him. (Defs. brief pg. 6, ll. 5). But this only highlights the issue of fact. Officer Dennett's own testimony is closer to Mr. Patel's because according to Officer Dennett "everything

happened very quickly." (Exhibit "5", pg. 24, ll. 14-17) Q: "Was it a split second?  Or was it closer to 30 seconds?  Or more? A: Everything happened very quickly.  Our entire issue or contact with Mr. Patel lasted just moments.").

Mr. Patel was no physical threat. Officer Dennett admits that he never attempted to flee, nor did Mr. Patel ever take a swing at him. (Exhibit "5" pg. 70, ll. 18-21; pg. 72 ll. 18-23.  Nothing Mr. Patel had done, or could have done, imperiled any other person. Mr. Patel's expert on police practices has already reviewed the record and will testify that the training for a situation like this is to slow things down, not speed them up to "moments."  Moments like this reflect anger, and unfortunately anger often leads to excessive force rather than proper police practices.

To try to insulate Officer Dennett from his rash actions, Defendants claim that Mr. Patel (who has never been in a brawl or had any martial arts training) "bladed off" like some kind of Kung Fu master or super hero. (Defs. brief pg. 6. ln. 11, "Patel bladed off with him in a fighting type stance and balled up his fists."  No more needs to be said.  This stretch is beyond the pale.  Mr. Patel did what any reasonable, scarred person would do: he put his arms up, palms out, and said "I'm sorry."  Unfortunately, this was not enough to calm the anger of Officer Dennett as by this time his adrenalin was flowing and it was all happening "in moments."

Once Mr. Patel was immediately grabbed and taken to the patrol car genuine issues of fact continue.  Defendants admit as much in their brief.  They claim as a matter of physics that the brake could only have happened when Mr. Patel started bucking like a bronco, and ask this Court to make this as a finding of law, but that's not how these cases are decided.  According to Mr. Patel, he was in such pain that he was being totally compliant with Officer Dennett who, according to his testimony, weighed between 215 and 230 pounds, (Exhibit "5", pg.40. ll. 7-12) and had Mr. Patel pinned against the car. Mr. Patel was surprised when he was told to "stop resisting" because he wasn't, and said so.  What actually happened is up to the jury to decide.

Even after the break of his arm, material issues continue. According to the Defendants, after his arm was broken, "Patel continued to resist the entire time that Smith was holding him down waiting for medical to respond." (Defs. Brief pg. 8, ll. 3-5). They admit that the ambulance took "10-15 minutes" and claim that Patel was resisting the entire time when what he was doing was suffering in pain. A quick look back at Ex. "4", the x-ray, explains why he was in too great of pain to be resisting.

While he was at the hospital, Defendants then inflicted further injury by giving Mr. Patel two tickets for criminal violations. As with the facts previously discussed, there are issues of fact with respect to these as well. As can been seen in the Declaration of Mr. Patel's counsel for both the criminal case and the civil case, Christopher Blakesley, Exhibit "6". Mr. Patel never plead guilty to any crime, nor would he. Mr. Patel did not commit any crime and would have gone to trial if the prosecutor has done anything else but dismiss the charges. One charge, obstruction, was dismissed immediately. The other, disorderly conduct, was dismissed with the provision that it could be reinstated if Mr. Patel engaged in criminal conduct, which was easy for Mr. Patel because he has no criminal history. Nonetheless, Mr. Patel never admitted to any guilt, nor was he ever convicted of any crime.

### B.    Case Law Does Not Insulate the Defendants from Liability.

The immunities mentioned by Defendants do not apply because Mr. Patel neither admitted any guilt in the criminal action, nor did he get convicted of any crime. Period. *See Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005), cert. denied, 545 U.S. 1128, 125 S. Ct. 2938, 162 L. Ed. 2d 866 (2005) (en banc-) (conviction for assault on police officer does not preclude suit for excessive force since the record leaves open the possibility that the excessive forces was used after the assault); *Hardrick v. City of Bolingbrook*, 522 F. 3d 758 (7th Cir. 2008) (conviction not a bar to claim of excessive force as it was not inconsistent with claim in civil rights action); *Bush v. Strain*,

9

513 F.3d 492 (5th Cir. 2008) (claim of excessive force used after plaintiff stopped resisting arrest

is permitted to proceed); *Dyer v. Lee*, 488 F. 3d 876 (11th Cir. 2007) (no bar to civil rights suit for

excessive force even where force used could have been raised as an affirmative defense in state

criminal case); *McCann v. Neilsen*, 466 F.3d 619 (7th Cir. 2006) (excessive force claim not barred

by conviction for resisting arrest or assault on officer); *Butler v. Compton*, 482 F.3d 1277 (10th Cir.

2007) (dismissal of burglary charge in plea agreement to admit guilt to other charge does not bar

suit for police misconduct on the burglary arrest); *Sullivan v. Gagnier*, 225 F.3d 161 (2d Cir. 2000)

(collecting cases); *Nelson v. Jashurek*, 109 F.3d 142 (3d Cir. 1997) (conviction for resisting arrest

did not bar claim for excessive force).  Again, Mr. Patel was convicted of no crime at all.  Also,

Mr. Patel never admitted any guilt to any crime whatsoever.[2]

    After asking this Court to find facts as a matter of law the way they see them, Defendants

next attempt to insulate themselves based upon an inaccurate assessment of law. Citing the case

---

[2] Extensive research yielded no results in with Nevada Statutes or Nevada Case Law regarding the definition of the term "submittal". For example, when entering the term "definition of submittal" or "define submittal" in Google Scholar search and/or Lexis Nexis Search, there are no results defining submittal.  However, "Submit" does have a legal definition.  To submit is, "[t]o end the presentation of further evidence an (a case) and tender a legal position for decision."  Blacks Law Dictionary, Deluxe 8th Ed., 1999. West Group, p. 1466.  Nowhere in any definition of submittal is there an element suggesting that the person submitting has admitted to any guilt.  Also, the definition clearly lacks any suggestion that a submittal amounts to a conviction in cases which are dismissed.  *See* Affidavit of Christopher L. Blakesley, Esq., attached hereto.

    In this District, only three pleas are available to a defendant.  They include "not guilty", "guilty", and "nolo contendre".  A submittal is a *substitution* for a plea, but not a plea.  Id.

    In this District, it is custom and practice that the term "submittal" connotes a situation in which a plea is never entered.  In fact, the Court agrees to dismiss the case without the defendant ever having to enter a plea or conviction.  The legal theory behind the custom and practice is that a party simply "submit" to the authority of the Court on the charge for an immediate determination.  Id.

    Upon submittal in this case, the court hearing the criminal case contemporaneously dismissed all charges.  Id.

10

*Smiddy v. Varney*, 665 F2d 261 (9th Cir. 1981), they claim that the Defendants are "immunized from damages." This claim is not even close to the *actual* law of the Ninth Circuit.

According to Defendants, once an officer has engaged in excessive force, all they need to do is to issue bogus tickets. Then, when the prosecutor dismisses the charges, as happened here, they can argue that because the prosecutor dismissed the charges somehow the officers are totally immunized. Federal law does not work that way; a free society does not work that way; the application of such law would be offensive to core Constitutional protections.

First of all, the facts of this case are much different from *Smiddy*. In *Smiddy*, the prosecutor decided to prosecute a murder case. Here, the prosecutor decided to dismiss both minor charges. There is no independent decision to proceed with the prosecution in this case and *Smiddy* does not apply.

Even if *Smiddy* did apply, the court in *Smiddy II*, 803 F.2d 1469 (9th Cir. 1986) made it clear that all *Smiddy* does is break the chain of damages so that damages cannot be attributed to the officers after the prosecutor has made an independent decision to prosecute. *Soo Park v. Thompson*, 851 F.3d 910,922 (9th Cir. 2017) ("that case [i.e., *Smiddy*] deals only with post trial calculation of damages." In *Smiddy*, the prosecutor made the decision to on the murder charge four days after the arrest, so the court held that damages were limited from four days after the arrest onward.

In this case, 95% of the damages occurred before the Court processed the minor charges in a ministerial manner like a parking ticket. Mr. Patel's arm – one of the strongest bones in his body – was snapped at the scene with the use of excessive force, well before the processing of the tickets. *Smiddy* does not apply, but even if it did, it would not "immunize" the Defendants from damages prior to the unsupported charges being systematically processed and then dismissed.

Defendants also neglect to point out that all *Smiddy* does is create a rebuttable presumption. The presumption can be rebutted by a showing of "pressure, undue influence, or knowing

misstatements by police." *Smiddy*, 803 F.2d at 1473.  Here, at the disputed facts discussed above show, there are genuine issues of fact that would need be resolved by the jury to determine whether police statements such as Mr. Patel was "blading off" or "bucking" were true.  What they failed to report, such as Mr. Patel's comment that he is "an American," can also rebut the presumption. *Borunda v. Richmond*, 885 F.2d 1384, 1390 (9th Cir. 1988) ("omissions in a report are sufficient to rebut the Smiddy presumption.").  To accept Defendants' version of the law as correct would be to assume that Mr. Patel is not entitled to ordinary Constitutional safeguards.

The fact that the prosecutor exercised little, if any, independent judgment with respect to the charges for the tickets given by the Defendants is additional evidence that *Smiddy* does not apply because the lack of independent judgment and the dismissal of the charges rebuts any presumption.  *Johns v. City of Eugene*, February 15, 2017, WL 663092 (presumption can be rebutted when "it would not be fair to say the prosecutor exercised independent professional judgment, *citing*, *Harper v. City of Los Angeles*, 533 F.3d 1010, 1027 (9th Cir. 2008).

After misapplying *Smiddy*, Defendants ask this Court to decide as a matter of law that there was probable cause in this case to arrest Mr. Patel, physically grab him, and then annihilate Mr.Patel's arm.  The opposite is true.  Mr. Patel never committed any crime, nor was there ever probable cause to use physical force against him.  Moreover, the *level* of force used in this case was the sort of force that has caused a 5' 7" person to be permanently disfigured, and there are several witnesses prepared to testify that the level of force was extreme, outrageous and certainly unnecessary.

The Defendants try to portray Mr. Patel as a rogue who was grabbing and shaking doors to closed businesses, but no witness other than Officer Dennett, the one who broke Mr. Patel's arm, saw this.  It is true that Mr. Pated was frustrated that they could not find food and proclaim in a loud voice to his three friends 15-20 feet in front of him that they could not find any fucking food

in the town, but this is not itself a crime; instead, it is Constitutionally-protected free speech.  There is no evidence that there were people other than his friends who even heard him say this, nor is there any evidence of any complaint being made by either a person or business.  In other words, Defendants are claiming that Mr. Patel disturbed the peace, even though Defendants cannot state the name of a single person who was disturbed by Mr. Patel's words, except the officer who broke Mr. Patel's arm.

As Mr. Travis Hesse's affidavit demonstrates, attached hereto, it is disingenuous to claim that the residents of the Sigel Apartments could have heard the comments from 519 feet away, even if it were true that Sigel Apartments were only 519 feet away.  It is side of the apartment building as well so sound would not easily carry in.  The sound is buffered between the subject incident and the apartments by a three-story building acting as a sound wall.  There are commercial jets flying very low overhead.  There are low-flying helicopters in the area.  There is significant traffic noise.  Yet, Defendants claim that it is a fact that Mr. Patel disturbed some unknown and unidentified person more than 500 feet away, as if it were an undisputable fact, which it clearly is not.

Similarly, Mr. Patel did not commit any crime or create probable cause by giving Officer Dennett the middle finger and saying, "fuck you, I'm an American."  Even if a racist comment had not been made to him, Ninth Circuit case law is quite clear that the First Amendment protects the right to say "fuck you" and give a police officer the middle finger.

Judge Kozinski has written for a unanimous panel of the Ninth Circuit that swearing at or giving the finger to a police officer is protected First Amendment conduct. *Duran v. City of Douglas, Arizona*, 904 F.2d 1372 (9th Cir. 1990).  This is particularly true in an instance like this when protected speech was in response to a racial slur.  The court's discussion is *Duran* is instructive here.  The court noted there was *no reason* to place Duran under arrest.

Missing from the record here is any legitimate, articulate reason for Aguilar to have detained Duran. There was no evidence of a danger to public safety, and Aguilar

13

was not executing a warrant. Nor is there any evidence that Duran was in possession of a controlled substance or had been or was about to be engaged in criminal activity. To be sure, Duran was intoxicated, but defendant does not contend that any law or ordinance prohibited Duran from riding as a passenger in an automobile while drunk. *Id.* at 1377.

While Mr. Patel is not seeking Summary Judgment because there are disputed questions of fact, should the jury conclude that facts as Mr. Patel describes them, then a directed verdict would be appropriate.  A look at each step of the court's analysis in *Duran* demonstrates this premise. One, there is no evidence that Mr. Patel was a danger to public safety or to the safety of the officer. Two, Officer Dennett was not exercising an arrest warrant.  Three, there is no evidence that Mr. Pateel was in possession of a controlled substance or engaged in criminal activity.  Four, there is no evidence by way of blood test or a breath test that Mr. Patel was drunk, and even if he did have something to drink that night, it is hardly illegal to walk on the streets of Las Vegas after having a drink.  If it were illegal, our town in the desert would likely not exist.

The facts here are strikingly similar to those in *Duran*.  Officer Dennett acted abruptly and out of retaliation when he was given the middle finger, which is Constitutionally-protected free speech.  He knows this and that is why he has changed his position on whether it happened.  As the court explained in *Duran*:

The Durans contend, and the district court held, that Aguilar stopped their car at least partly in retaliation for the insult he received from Duran. If true, this would constitute a serious First Amendment violation. "[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Houston v. Hill,* 482 U.S. at 461, 107 S.Ct. 2502 at 2509. The freedom of individuals to oppose or challenge police action verbally without thereby risking arrest is one important characteristic by which we distinguish ourselves from a police state. *Id.* at 462–63, 107 S.Ct. at 2510. Thus, while police, no less than anyone else, may resent having obscene words and gestures directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment. *Id.* at 1377-1378.

Unfortunately for Mr. Patel who will live with a mangled arm for the remainder of his life, officer Dennett did not heed this clearly established law.

14

1         Liability is also established based upon violation of the Fourth Amendment.  Given the First

2 Amendment discussion above, there was no right to arrest Mr. Patel; therefore, seizing him and

3 arresting him was a violation of the Fourth Amendment.  Officer Dennett did not ask Mr. Patel to

4 come over to the car, nor did he slow down and talk with Mr. Patel when Mr. Patel held his arms

5

6 up and said he was sorry.  Instead he grabbed him in "moments," officer Dennett's own words,

7 marched him to the car and then applied force that broke his arm.  This should not have happened,

8 and Summary Judgment should not be granted.

9         DATED this 5th day of May, 2017.

10                               LUCHERINI BLAKESLEY COURTNEY, P.C.

11

12                       By:  /s/ John C. Courtney, Esq.
                              JOHN C. COURTNEY, ESQ.

13                               Nevada Bar No. 11092

14                               CHRISTOPHER L. BLAKESLEY, ESQ.
                              Nevada Bar No. 11922

15                               3175 S. Eastern Avenue
                              Las Vegas, Nevada 89169

16                               Ph.: (702) 608-3030/Fax: (702) 534-6354
                              Email: info@lbclawgroup.com

17                               *Attorneys for Plaintiff*

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to FRCP 5(b), I hereby certify that I am an employee of Lucherini Blakesley Courtney, P.C., and on May 5, 2017, I served a true and correct copy of the foregoing PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, was served electronically through the Court's electronic filing system upon the following:

Lyssa S. Anderson, Esq.
Ryan W. Daniels, Esq.
1980 Festival Plaza Dr., Ste. 650
Las Vegas, Nevada 89135
*Attorneys for Defendant*

       /s/ Travis Hesse
An employee of Lucherini Blakesley Courtney, P.C.

16

# EXHIBIT "1"

# EXHIBIT "1"

Sagar Navin Patel  -  12/5/2016
Sagar Navin Patel vs. Officer Boe D. Dennett, et al.

```
 1                   UNITED STATES DISTRICT COURT

 2                       DISTRICT OF NEVADA

 3   SAGAR NAVIN PATEL,           )
                                  )
 4         Plaintiff,             )
                                  )
 5   vs.                          )  CASE NO.:
                                  )     2:16-cv-00730-JAD-PAL
 6   OFFICER BOE D. DENNETT; DOES )
     I through V, inclusive; and  )
 7   ROE CORPORATIONS VI through  )
     X, inclusive,                )
 8                                )
           Defendants.            )
 9   _____)

10

11

12             DEPOSITION OF SAGAR NAVIN PATEL

13

14             Taken on Monday, December 5, 2016
                     At 10:23 a.m.

15

16          At 1980 Festival Plaza Drive, Suite 650
                     Las Vegas, Nevada

17

18

19

20

21

22

23

24

25   REPORTED BY:  JEAN DAHLBERG, RPR, CCR 759, CSR 11715
```

1      Q.   Okay.  As you were walking down Paradise, did

2   you attempt to enter any of the businesses?

3      A.   No.

4      Q.   We've gone ahead and premarked this as Exhibit A

5   to your deposition.

6           (Exhibit A was marked for identification.)

7   BY MS. ANDERSON:

8      Q.   If you would just take a look at that for a

9   moment --

10     A.   Okay.

11     Q.   And I'm just going to ask you some questions

12   about it.

13          Mr. Patel, did you have an opportunity to read

14   through the document that's been placed in front of you

15   marked as Defendants' Exhibit A?

16     A.   Yes, I did.

17     Q.   And as I sat here, you looked through each page;

18   is that right?

19     A.   Correct.

20     Q.   You read the entire document?

21     A.   Correct.

22     Q.   Okay.  Do you have a recollection of

23   investigators from the Las Vegas Metropolitan Police

24   Department speaking with you at UMC Hospital?

25     A.   I do.

**Sagar Navin Patel  -  12/5/2016**
**Sagar Navin Patel vs. Officer Boe D. Dennett, et al.**

1       Did I read that correctly?

2   **A.   Yes, you did.**

3   Q.   And is that a fair description of how you felt

4   at that time?  Cranky?

5   **A.   More frustrated would probably be more -- more**

6   **precise, yes.**

7   Q.   And when you say "frustrated," frustrated

8   because you were hungry and you wanted something to eat?

9   **A.   Uh-huh.**

10  Q.   And then moving to Line 17, you actually use

11  that word.  It reads, And so I just got frustrated, and

12  I was just like -- I just shouted -- moving onto

13  Line 18 -- Is there any fucking place to eat around this

14  place?

15      Did I read that correctly?

16  **A.   Yes, you did.**

17  Q.   And so you were frustrated and, in your words,

18  you shouted; is that right?

19  **A.   Uh-huh.**

20  Q.   And as you can see in Lines 18 through 20, it

21  looks like, when you were shouting, you were using the

22  "F" word; is that right?

23  **A.   That's correct.**

24  Q.   And you used it more than once?

25  **A.   Probably, yeah.  Probably, I would say.**

**Sagar Navin Patel  -  12/5/2016**
**Sagar Navin Patel vs. Officer Boe D. Dennett, et al.**

1      Q.    Then at Line 22, it reads, And I was talking to,

2   you know, one of my cousins that were -- we were

3   separated by, like, 15 to 20 feet.

4           Did I read that correctly?

5      A.    Yes.

6      Q.    And so you were separated from your cousins by

7   about 15 to 20 feet?

8      A.    Correct.

9      Q.    And the shouting that you were doing, the

10  shouting was directed towards your cousins?

11     A.    It was in that direction.

12     Q.    All right.  At that distance?

13     A.    Uh-huh.

14     Q.    You wanted them to hear you?

15     A.    Yeah.

16     Q.    And then it was at that point in time, looking

17  at Line 25, there happened to be an officer on the

18  left-hand side -- moving onto Line 26 -- who I didn't

19  see until he -- he had his windows open or something,

20  and he was, like, why don't you go back to where you

21  came from.

22          Did I read that correctly?

23     A.    Yes.

24     Q.    So is it fair to say you didn't see the police

25  officer until after he said something to you?

1   **A.   Yeah.  I didn't notice he was there until he**

2   **responded to me.**

3   Q.   And you told the investigators that he said, Why

4   don't you go back to where you came from?

5   **A.   Correct.**

6   Q.   Continuing on that Line 27, you told the

7   investigators, And then I was, like, What?  And then he

8   was, like, You heard me.

9        Did I read that correctly?

10  **A.   Yes.**

11  Q.   And continuing on on that line, And then he was

12  like -- oh, sorry -- And...and I was like, shut the fuck

13  up.  What?  And like, fuck you.

14       Did I read that correctly?

15  **A.   Yes.**

16  Q.   All right.  So you told investigators that he

17  said to you, Why don't you go back to where you came

18  from?  You said, What?

19  **A.   Uh-huh.**

20  Q.   He said, You heard me.  And then it was at that

21  point in time that you told him, "Shut the fuck up" and

22  "Fuck you"; is that right?

23       MR. BOYD:  You're asking if this is what he

24  said?

25  ///

1    Q.   At the time that that police officer exited the

2    vehicle and started coming towards you --

3    **A.    Uh-huh.**

4    Q.   -- did you see any other police officers other

5    than that police officer and the one that you knew was

6    driving the car?

7    **A.    I know there was two in that police car.**

8    Q.   Okay.  But any others, other than that at that

9    time?

10   **A.    At that time, no.  I don't remember.**

11   Q.   When the police officer got out of the vehicle,

12   where were you located on the sidewalk?  Actually, were

13   you on the sidewalk?

14   **A.    I was on the sidewalk, yes.**

15   Q.   And where were you in -- how far away were you

16   from the patrol car, best estimate.

17   **A.    Maybe about 10 feet away.**

18   Q.   Okay.  And when the police officer got out of

19   the patrol car, did he say anything to you?

20   **A.    Yeah.  I think he said, like, What did you say?**

21   **What did you say to me?  He cussed, I think.  I don't**

22   **remember.**

23   Q.   But you would agree with me that that statement,

24   what did he say, or him cussing, isn't found in your

25   response to Interrogatory No. 7?

1    This one looks to be very similar to the first picture.

2    This was taken, again, in your home?

3        **A.    Yes, correct.**

4        Q.    All right.  And then it looks like the next

5    picture is similar to the one we looked at a moment ago?

6        **A.    Yeah.**

7        Q.    Actually, it looks like --

8            All right.  Turn to the very last picture, which

9    is Patel 100042.  Where is this picture taken?

10       **A.    This was at TriNet.**

11       Q.    And would you spell TriNet for the court

12   reporter?

13       **A.    Yes.  It's T-r-i-N-e-t.**

14       Q.    And that's where you used to work?

15       **A.    Correct.**

16       Q.    And was this your workstation at TriNet?

17       **A.    Yeah.**

18       Q.    And do you remember when this photograph was

19   taken?

20       **A.    Probably around the time when I got off -- got**

21   **off disability and went back.**

22       Q.    And do you know who took the picture?

23       **A.    A co-worker, but I don't remember who.**

24       Q.    You don't remember the name of the co-worker

25   that took the photograph?

Sagar Navin Patel - 12/5/2016
**Sagar Navin Patel vs. Officer Boe D. Dennett, et al.**

1      A.   No.  Because I was -- it was someone from my

2    team, so I don't remember exactly who.

3      Q.   Okay.  Of these photographs, I mean, do you have

4    any of these photographs in their native format?  Like

5    the co-worker that took this picture of you, did they

6    e-mail it to you or text it to you or --

7      A.   I'm pretty sure that there is, like, an original

8    source somewhere.

9      Q.   Okay.  Why do you think the officer made a

10   racial comment to you?  I mean, why did you believe what

11   he said was a racial comment?

12     A.   The words that he chose, for one.

13     Q.   Anything else?

14     A.   And the tone that he used.

15     Q.   Any other reason?

16     A.   The choice of words and the tone combined made

17   me believe.

18     Q.   What was it about the choice of words?

19     A.   I guess, where you're from, I guess, means, like

20   where your original -- where you're originally from, you

21   know.  People ask me all the time, Where are you from?

22   You know, living in -- from my experience, my personal

23   experience living in this country, people don't

24   automatically assume that I'm American; not a lot of

25   people do.  And I've gotten that all the time.

21   that you complaining about this town?

22

# EXHIBIT "2"

# EXHIBIT "2"

## AFFIDAVIT OF TRAVIS HESSE

STATE OF NEVADA      )
                          ) SS:
COUNTY OF CLARK     )

     I, TRAVIS HESSE, (hereinafter "Affiant"), do hereby swear under penalty of perjury that the assertions of this Affidavit are true:

1.  I make this affidavit based upon facts within my own knowledge, except as to those matters which are stated upon information and belief.  I am over the age of eighteen and am competent to testify to the following if so called upon.

2.  On May 5, 2017, I went to the area of the subject incident and measured the physical distance between the Siegel Suites apartments and surrounding businesses.

3.  I measured the distance between the Siegel Suites to the Funhog Ranch, which appeared to be a bar or club, to be approximately 46.5 feet.

4.  I measured the distance between the Siegel Suites to another neighboring bar called Muddy's to be approximately 126 feet.

5.  While at the area of the subject incident, I observed multiple low-flying helicopters, commercial planes, and heavy vehicle traffic in and around the area.

6.  I also observed what appeared to be a 3 story building between the Siegel Suites apartments and the area of the subject incident, meaning there was a substantial sound barrier between the Siegel Suites apartments and the area of the subject incident.

. . .

. . .

. . .

1

7. Upon information and good faith belief, it would be difficult to hear anyone yell in the area due to the level of above-mentioned noise.

FURTHER AFFIANT SAYETH NAUGHT.

DATED this 5th day of May, 2017.

TRAVIS HESSE

SUBSCRIBED and SWORN to before me
this ___ day of May, 2017.

NOTARY PUBLIC

J. MEJIA-BARRAGAN
Notary Public State of Nevada
No. 15-3374-1
My appt. exp. Aug. 25, 2019

# EXHIBIT "3"

# EXHIBIT "3"

PATEL v DENNETT

CONDENSED TRANSCRIPT OF

THE DEPOSITION

OF

OFFICER JOSEPH SMITH

TAKEN ON

WEDNESDAY, NOVEMBER 2, 2016

AT 9:56 a.m.

IN LAS VEGAS, NEVADA

REPORTED BY:   MARY DANE McCOY, CCR 219

MARY DANE McCOY, CERTIFIED COURT REPORTER
LAS VEGAS, NEVADA (702)655-9900

21

1    A.    Yes.
2    Q.    And did Officer Hanks then pull over behind
3    you or in front of you?
4    A.    I don't recall that.
5    Q.    And when you pulled over, did you pull over
6    to the north of the crowd?  Or kind of in the middle of
7    the crowd?  Or south of the crowd?  Were they in front
8    of you when you pulled over, or were they slightly in
9    your --
10   A.    I don't recall.
11   Q.    Okay.  So when you pulled over, you were
12   pulled over at approximately somewhere in the vacant
13   lot area of that sidewalk?
14   A.    We were -- when we pulled over, we just
15   pulled over to the side of the street.  Just south -- I
16   would say parallel to the vacant lot, facing
17   northbound.
18   Q.    Would it be closer to the south end of that
19   vacant lot or the north end of the vacant lot?
20   A.    I would estimate it was closer to the south
21   end of the lot.
22   Q.    Okay.  Well, let me ask this:  What do you
23   recall after pulling over?  Can you walk me through
24   maybe the first five seconds of when you pulled over
25   what happened?

MARY DANE McCOY, CERTIFIED COURT REPORTER
LAS VEGAS, NEVADA (702)655-9900

22

1    A.    Yes.  I recall Officer Dennett getting out,
2    making contact with Patel.  I believe he gave him
3    verbal commands to stand in front of the car which is
4    where we do our interviews.  I remember walking past
5    Patel and telling the crowd to back up.  They were --
6    because they didn't seem like a threat at all, so I
7    just wanted to keep them back a little bit so Officer
8    Dennett could speak with Patel because he was the only
9    one that was acting the way he was as a group.
10   Q.    So kind of separating him from the crowd so
11   you could have a conversation with him?
12   A.    Yes.
13   Q.    Let's back up little bit.  From the time that
14   you first saw Mr. Patel until the time that you had
15   pulled over, was he always on the sidewalk or was he in
16   other places other than the sidewalk during that
17   timeframe, from when you first saw him until you pulled
18   over?
19   A.    I would say he was always on the sidewalk.
20   Q.    And did you ever see him close to any
21   businesses, trying to open any doors?
22   A.    No.
23   Q.    So the entire incident, can it be isolated to
24   the parking lot or to the sidewalk on the side of
25   Paradise?

MARY DANE McCOY, CERTIFIED COURT REPORTER
LAS VEGAS, NEVADA (702)655-9900

23

1    A.    Yes.
2    Q.    And was there ever any time that Mr. Patel
3    left the sidewalk area prior to being transported by
4    ambulance?
5    A.    Yes.  I believe he walked out to the street a
6    couple times because he seemed very, very intoxicated.
7    He was walking -- I believe he took a couple steps off
8    the sidewalk at some point to yell and scream or when
9    he flipped us off.  I know that had something to do
10   with us pulling him over or stopping him, if you will.
11   Q.    Is that he had come off the sidewalk into the
12   street?
13   A.    Yes, into the roadway, yes, sir.
14   Q.    So at what point in time would he have come
15   into the roadway?  Would that have been prior to you
16   pulling over?
17   A.    Yes.
18   Q.    Was that the only time that he went into the
19   roadway?
20   A.    I think he went into the roadway when Officer
21   Dennett escorted him to the front of the patrol car, he
22   was now off the sidewalk on to the pavement, standing
23   in front of the patrol car.
24   Q.    When he was standing in front of the patrol
25   car, was he standing in front of the grill of the

MARY DANE McCOY, CERTIFIED COURT REPORTER
LAS VEGAS, NEVADA (702)655-9900

24

1    vehicle?
2    A.    I don't recall.  I think he was off to the --
3    I think he was off to the left side facing the patrol
4    car.
5    Q.    You mean the right side?
6    A.    No.  If you are facing the patrol car, and
7    the grill is in the center, I believe Officer
8    Dennett --
9    Q.    Oh, okay, if you are facing --
10   A.    To the left.
11   Q.    It would have been the right front fender
12   area?
13   A.    Yes, yes.
14   Q.    And do you recall seeing Officer Dennett
15   first make physical contact with Mr. Patel?
16   A.    No, sir, I don't recall that because I went
17   past the two of them to deal with the crowd.
18   Q.    So when he first made contact, physical
19   contact with Mr. Patel, to the best of your
20   recollection, you would have not been looking that
21   direction?
22   A.    No.
23   Q.    So when you finally did turn back to look
24   that direction, he was already in contact with him?
25   A.    He was -- when I turned back to look, I

MARY DANE McCOY, CERTIFIED COURT REPORTER
LAS VEGAS, NEVADA (702)655-9900

25

1 believe -- I don't want to keep guessing, but I believe
2 he -- when I turned back to look at him, I saw Officer
3 Dennett escorting him to the patrol car because he
4 refused to stand in front of the patrol car.
5     Q.   When he was escorting him, did he have him in
6 any sort of hand lock or any other physical contact
7 that you saw while he was escorting him?
8     A.   Just other than the handcuffing arm lock,
9 which is the technique approved by the department,
10 with, I believe, his right arm behind his back, and
11 Officer Dennett holding his left arm, upper arm area to
12 escort him back to the patrol car.
13    Q.   So from your vantage point, you could see the
14 chest of Mr. Patel, but not his back?
15    A.   From my vantage point, I probably saw the
16 side, the side of that.
17    Q.   Okay.  So if you saw the side of it, you're
18 describing from the side view that you would have seen
19 the right arm --
20    A.   Yes.
21    Q.   -- on a lock holding his right arm back, and
22 the left arm would have been -- you could just see the
23 arm, but not the hand, because it would have been going
24 through Mr. Patel?
25    A.   Yes.

MARY DANE McCOY, CERTIFIED COURT REPORTER
LAS VEGAS, NEVADA (702)655-9900

26

1     Q.   Okay, so he escorts him to the front of the
2 car and toward the right front fender.  So Mr. Patel
3 would have been facing west when he was at the front of
4 the car?
5     A.   Yes.
6     Q.   And facing west, did he put his hands on the
7 hood or did you see -- what did you see next?
8     A.   Okay, what I saw was Officer Dennett, who was
9 probably about twice his size and weighs a lot more
10 than Patel, I saw him escort him up to the car to the
11 right side fender, if you will.  I saw Patel lean back
12 and resist Officer Dennett, and resist walking, resist
13 him being escorted to the patrol car.  When he got to
14 the patrol car, I saw Patel put his left hand or right
15 hand -- I'm not a hundred percent sure -- I'm assuming
16 -- which bone did Patel break?
17    Q.   I can represent to you that his left arm was
18 broken.
19    A.   His left arm was broken?
20    Q.   Yes.
21    A.   So he would have put his right arm on to the
22 hood.  So then obviously the -- what I said earlier
23 about that was backwards.
24    Q.   That's fine.
25    A.   But anyway he put the right hand on the hood

MARY DANE McCOY, CERTIFIED COURT REPORTER
LAS VEGAS, NEVADA (702)655-9900

27

1 of the car and pushed back into Officer Dennett as
2 Officer Dennett was pushing the opposite direction
3 because they were just -- they were just pushing
4 against each other.  And what I saw was if I go over
5 there, and I control Patel's right hand and get that
6 behind his back, we can handcuff him, and sit him down,
7 and calm him down, so that there is not this pushing,
8 this shoving match going on between Officer Dennett and
9 Patel.
10    Q.   Okay.  So we'll go through this again just so
11 it's clear because I don't want to be caught up on
12 the left arm, right arm.
13    A.   Right.
14    Q.   So from your vantage point, his left arm is
15 behind his back, his right arm is on the hood, that
16 would have put Officer Dennett's right arm on his right
17 shoulder?
18    A.   Correct.
19    Q.   Like this?
20    A.   Correct.
21    Q.   Then while Patel is pushing backwards, you
22 said Officer Dennett was pushing forward, so I'm
23 assuming that would have to be with his right arm?
24    A.   Yes.
25    Q.   He is pushing his right shoulder forward?

MARY DANE McCOY, CERTIFIED COURT REPORTER
LAS VEGAS, NEVADA (702)655-9900

28

1     A.   Yes.
2     Q.   Then as he is pushing his right shoulder
3 forward, and his right arm is on the hood of the car,
4 and his left arm is holding a handcuffing arm lock,
5 then what happened next?
6     A.   I saw that it could go one of two ways.
7 Officer Patel -- excuse me -- Patel could try to throw
8 punches, try to elbow him, try to kick him.  The goal
9 is to just stop that so nobody gets hurt.  So when
10 Officer Hanks arrived, I directed her to the crowd, to
11 watch the crowd.  As I approached both of them,
12 thinking, if I grab his arm that he is using to prop
13 himself up and lean back, if I grab that, and put that
14 behind his back real quick, we are done.  You know,
15 like, there is not going to be any more pushing,
16 shoving, no resistance offered by Patel.  As I
17 approached, I can't recall if it happened when I
18 touched his arm or right before I touched his arm to
19 grab his arm from the hood is when his bone broke.  We
20 could hear a break.
21    Q.   It was a pretty loud break?
22    A.   It was.
23    Q.   And so as not to interrupt your flow here,
24 what happened at the point of the break?
25    A.   At the point of the break, we both just

MARY DANE McCOY, CERTIFIED COURT REPORTER
LAS VEGAS, NEVADA (702)655-9900

# EXHIBIT "4"

# EXHIBIT "4"





LEFT MLM



PATEL 100030



PATEL 100031



PATEL 100032



PATEL 100033



PATEL 100034



PATEL 100035

# EXHIBIT "5"

# EXHIBIT "5"

PATEL v DENNETT

CONDENSED TRANSCRIPT OF

THE DEPOSITION

OF

OFFICER BOE DENNETT

TAKEN ON

TUESDAY, NOVEMBER 1, 2016

AT 9:57 a.m.

IN LAS VEGAS, NEVADA

REPORTED BY:  MARY DANE McCOY, CCR 219

MARY DANE McCOY, CERTIFIED COURT REPORTER
LAS VEGAS, NEVADA (702)655-9900

5

1  one of us is talking at a time, it has to put her into
2  overdrive.  So I'll try not to speak over you, and you
3  try not to speak over me.
4          You will want to wait until I completely
5  finish the question and wait a little pause as well in
6  case your attorney wants to put an objection on the
7  record, then go ahead and answer the question.
8          Did you review anything in preparation for
9  your deposition today?
10     A.   I spoke with the attorney yesterday.
11     Q.   Did you review any documents?
12     A.   With my attorney?
13     Q.   Uh-huh.
14          MS. ANDERSON:  It's fine for you to tell him
15  what you looked at, but just nothing that was spoken or
16  said between us.
17          THE WITNESS:  Yes, sir.
18  BY MR. COURTNEY:
19     Q.   Which documents did you review?
20     A.   I had a chance to review my original use of
21  force report, the citation that was written, and I
22  believe my internal affairs transcript.
23     Q.   If I could ask you to open the binder to Tab
24  No. 3.  Is this the internal investigation transcript
25  you were talking about?

6

1      A.   I believe this one is much more extensive
2  than the one I reviewed.
3      Q.   Is that your transcript?
4      A.   This looks like it also has a summary of
5  investigation.
6      Q.   Okay.
7      A.   Which I did not review.  I only reviewed my
8  actual questioning while I was in internal affairs.
9      Q.   Then if I could have you turn to Tab 14.  Is
10  this the use of force document you were talking about?
11     A.   I believe so, yes, sir.
12     Q.   When you reviewed any of these documents, did
13  you see anything inaccurate in any of the documents?
14     A.   No, sir.
15     Q.   Do you have any questions before we get
16  started?
17     A.   No, sir.
18     Q.   If I could direct you to page 11 or Tab 11, I
19  apologize, have you ever seen this document before?
20     A.   Yes, sir.
21     Q.   Could you identify it for the record?
22     A.   My attorney called them a specific word.
23  Here you go, Interrogatory.
24     Q.   Do you recognize these as being your
25  Responses to Interrogatory questions?

7

1      A.   Yes, sir.  I think we amended one of the
2  questions yesterday.
3      Q.   Do you know which question it was that you
4  amended?
5      A.   No. 6.
6      Q.   What did you amend that question to say?
7      A.   At the time I was speaking with my attorney,
8  I didn't recall that part of the incident.  Would you
9  like me to read it?
10     Q.   Yeah, sure.
11     A.   Just says, Explain whether Mr. Patel gave his
12  middle finger (meaning pointed it at Officer Dennett)
13  and if so, precisely where Dennett was at the time,
14  where Mr. Patel was located, and what, if anything,
15  Mr. Patel said when he gave Officer Dennett the finger.
16          And I didn't recall, in speaking to my
17  attorney, that I was ever given the finger, or that I
18  ever saw Mr. Patel give me the finger.
19     Q.   Okay.  And so as you sit here today, you have
20  no recollection of Mr. Patel ever giving you the middle
21  finger?
22     A.   No, sir.
23     Q.   No other changes other than that change in
24  your interrogatory?
25     A.   I don't believe so, no, sir.

8

1      Q.   I'd like to offer this as Exhibit 11, the
2  Interrogatories.
3          MS. ANDERSON:  Fine.
4  BY MR. COURTNEY:
5      Q.   So this statement that was originally in the
6  responses, it says, As I walked towards Mr. Patel,
7  Mr. Patel put up both of his middle fingers and said,
8  "Fuck you".
9          That is not what you recall happening?
10     A.   I don't recall that, no, sir.
11     Q.   Do you recall Mr. Patel using the phrase,
12  "fuck you"?
13     A.   Yes, sir.
14     Q.   Do you know how many times he used that
15  phrase?
16     A.   Several.
17     Q.   How many would you estimate, if you could
18  give me a range?  10 to 20?  5 to 10?
19     A.   I couldn't say.
20     Q.   Was it more than five times?
21     A.   I couldn't say, sir.
22     Q.   Could you say whether it was more than three
23  times?
24     A.   Again, I couldn't say.
25     Q.   Could you say that it was more than once?

**17**

1 told him to be quiet, and Patel yelling back, like,
2 fuck you, and that he hates this city.  So then Officer
3 Dennett said, Then go back home.
4    Q.    And is -- are you rather certain he said, Go
5 back home, or could it have been some variation similar
6 to that?
7    A.    It could have been a variation.  Could have
8 been, Go home, Go back home.  Nothing -- it was nothing
9 racist or anything like that.
10    Q.    Could it have been, Go back where you came
11 from?
12    A.    To -- oh --
13    Q.    I'm sorry, in that variation, Go back to
14 where you came from?
15    A.    I don't think so.
16    Q.    But as you sit here today, you can't remember
17 exactly?
18    A.    No, I'm not going to unless, you know --
19    Q.    I don't want you to guess.
20    A.    No, I don't want to.
21    Q.    Okay.  So Officer Dennett says something to
22 the effect of, Go back home, or, Go back to your home,
23 or something to that effect, Go back to where you came
24 from, or something to that effect in response to
25 Mr. Patel talking about I can't find anything to eat,

**18**

1 and, I hate this city?
2    A.    Yes.
3    Q.    He also says something to him to the effect
4 of, Be quiet, or, Quit yelling, or something to that
5 effect as well?
6    A.    Yes.
7    Q.    Do you know if he made any other
8 communication besides those two general points prior to
9 exiting the vehicle?
10    A.    No.
11    Q.    So the best of your recollection is that
12 there were only two points that Officer Dennett had
13 made to Mr. Patel before exiting the vehicle, and those
14 points were something to the effect of, Go back to your
15 home, or something to that effect --
16    A.    Yes.
17    Q.    -- similar, and, Stop yelling, or, Be quiet,
18 or something to that effect, and no other exchange?
19    A.    Yes.
20    Q.    And when Officer Patel said these things --
21         MR. BOYD:   Dennett.
22 BY MR. COURTNEY:
23    Q.    -- Officer Dennett -- thank you -- when he
24 said these things, did he say them back-to-back, Be
25 quiet, Go back home?  Do you remember?

**19**

1    A.    I don't remember.
2    Q.    Do you remember if he said one before the
3 other?
4    A.    No, sir.
5    Q.    Do you remember if Mr. Patel reacted in any
6 way to Mr. Dennett's verbal contact?
7    A.    Yes, I do remember that specifically because
8 we just wanted -- we just got done eating, and we were
9 just -- we weren't trying to, you know, make any kind
10 of stops at that time.  We were just trying to go -- I
11 can't remember our destination, but we were just trying
12 to get where we were going.  And we weren't looking to
13 stop him or anything, we were just trying to get him to
14 calm down.  And when Officer Dennett initiated verbal
15 contact with him, he escalated, and became more
16 aggressive, and more agitated, and got louder.
17    Q.    What kind of things did you see that caused
18 you to believe that he had escalated?
19    A.    He flipped us off with two middle fingers and
20 said, Fuck you.
21    Q.    Okay.  I know this is kind of a nuance
22 question, and it probably won't come across well on the
23 record, I'll just state it in advance, but do you
24 recall what kind of flipping off he did?  Whether the
25 hand was balled like a fist with the fingers sticking

**20**

1 up?  And I'm using a visual like this.  Or whether it
2 was that kind where you are just jacking the fingers
3 down with the -- you know what I'm talking about?
4    A.    Yes.
5    Q.    You see people flip off like this and this?
6    A.    Yes.
7    Q.    Do you recall how he was doing it?
8    A.    I don't recall it.
9    Q.    But you for sure saw middle fingers sticking
10 up?
11    A.    Yes.
12    Q.    When you saw these middle fingers sticking
13 up, was there any exchange between you and Officer
14 Dennett in terms of communicating, like, he just
15 flipped us off or something like that?
16    A.    I don't recall.  I know that we were, like,
17 we both thought to each other, let's go out on this guy
18 and tell him to calm down.
19    Q.    Who exits the vehicle first?
20    A.    I don't recall who exits the vehicle first,
21 but I recall putting my lights on and pulling over.
22    Q.    When you pulled over, there was a vehicle in
23 trail; is that correct?
24    A.    Yes.
25    Q.    That was driven by Officer Hanks?

37

1  lying down to the ground.  I guess it's a bad question,
2  strike that.
3        When he was brought to the ground, was he
4  brought into a lying position or a seated position?
5     A.  I believe he was laying.
6     Q.  Was he laying down on his stomach or his
7  back?
8     A.  I believe he was facedown.
9     Q.  Was his left arm still behind his back while
10 he was in the lying position facedown?
11    A.  I can't recall, sir.
12    Q.  Was his right arm behind his back at that
13 time?
14    A.  I can't recall, sir.
15    Q.  Was he restrained in any manner whatsoever at
16 that point in time?
17    A.  In any manner whatsoever, sir?
18    Q.  Yes.  Whether that be by hands being placed
19 on him and holding him down, whether that be by
20 handcuffs, or any other form of restraining?
21    A.  Yes, sir.
22    Q.  How was he being restrained?
23    A.  I know Officer Smith maintained contact with
24 Mr. Patel even while he was lying.
25    Q.  Do you recall what kind of contact he

38

1  maintained with him?
2     A.  I cannot, no, sir.
3     Q.  Do you recall if he had his knee in his back?
4     A.  His knee in his back?
5     Q.  If Officer Smith had his knee on the back of
6  Mr. Patel?
7     A.  I don't recall.
8     Q.  How long have you worked for the Las Vegas
9  Metropolitan Police Department?
10    A.  Almost nine years.
11    Q.  Do you have any prior military service?
12    A.  No, sir.
13    Q.  How old were you when you joined the police
14 force?
15    A.  I'd have to do some math.  I believe 24 years
16 old.
17    Q.  24.  Do you have a college education?
18    A.  No, sir.
19    Q.  And do you have any training in any type of
20 martial arts?
21    A.  Can you define training?
22    Q.  Sure.  Have you ever trained informally or
23 formally in the martial arts?
24    A.  No, sir.
25    Q.  Have you ever trained formally in any of the

39

1  martial arts?  And what I mean by that is gone to a
2  place where you have an instructor teaching you about
3  any of the martial arts?
4     A.  Yes, sir.
5     Q.  Can you describe that training to me?
6     A.  Can I estimate a timeframe?
7     Q.  Sure.
8     A.  From about the time of 14 to 16 I went to a
9  karate studio in Henderson, Nevada.
10    Q.  And what type of karate was that?
11    A.  American Kenpo karate.
12    Q.  Did you obtain any belts?
13    A.  Yes, sir.
14    Q.  What is the highest belt you obtained?
15    A.  Purple, I believe.
16    Q.  Did you cease to train in that particular
17 martial art at the age of 16?
18    A.  Yes, sir, sometime thereabouts.
19    Q.  Did you train in any of the other martial
20 arts or any other martial art after that time?
21    A.  No, sir.  Well, let me back up.  Do you mean
22 including -- not martial arts specifically, but did I
23 receive defensive tactics training in the police
24 academy?
25    Q.  That is where we are going next.  Any other

40

1  type of hand-to-hand combat training?
2     A.  No other hand-to-hand combat training outside
3  of the police academy, no, sir.
4     Q.  In the police academy, you take a defensive
5  hand-to-hand combat training course?
6     A.  Defensive tactics, yes, sir.
7     Q.  Defensive tactics.  And what is your weight
8  or what was your weight approximately at the time of
9  the incident that we have been discussing today?
10    A.  Again, can I give a range?
11    Q.  Sure.
12    A.  215 to 230.
13    Q.  What would you estimate Mr. Patel's weight to
14 have been on that date?
15    A.  I can't recall, sir.
16    Q.  Do you recall if he was bigger than you or
17 smaller than you?
18    A.  I believe he was smaller than me.
19    Q.  Do you recall whether he was shorter than you
20 or taller than you?
21    A.  I don't recall.
22    Q.  As you sit here today, you have no
23 recollection whether he was taller or shorter than you?
24    A.  I could speculate, but specifically, I cannot
25 recall.

69

1  possibly a year.
2      Q.   I'll tell you what, go ahead and take a
3  break, stretch.  I'm going to see what questions I have
4  left, and we might be wrapping it up pretty soon.
5      A.   Okay.
6      Q.   We are off the record.
7              (Whereupon, a recess was taken from
8           11:37 a.m. to 11:48 a.m.)
9  BY MR. COURTNEY:
10     Q.   If I could direct you to Tab No. 12, this is
11 a set of Request for Admissions.  Have you ever seen
12 this document before, sir?
13     A.   What is this now, sir?
14     Q.   I'm going to report to you they are Request
15 for Admissions, they were from your attorney's office
16 to our office where you answered some questions either
17 admitting or denying or some other response.
18     A.   Okay.
19     Q.   Do you recall ever seeing this document?
20          MS. ANDERSON:  You will be receiving an
21 amendment to this as well based on what Officer Dennett
22 has told you today about his recollection.
23          MR. COURTNEY:  Okay.  And that would be an
24 amendment to Response No. 4; is that correct?  Oh,
25 wait, maybe --

MARY DANE McCOY, CERTIFIED COURT REPORTER
LAS VEGAS, NEVADA (702)655-9900

70

1          THE WITNESS:  3.
2          MR. COURTNEY:  3?
3          MS. ANDERSON:  No, it's the one that just
4  talks about the giving of the finger, I think it's --
5          MR. BOYD:  5.
6          MS. ANDERSON:  -- 5, yes.
7          MR. COURTNEY:  Okay.
8          THE WITNESS:  Did you say one of these is for
9  me, sir?
10         MR. COURTNEY:  Please go ahead.  These are
11 colder if you want a colder one.
12         THE WITNESS:  All the same, thank you, sir.
13 BY MR. COURTNEY:
14     Q.   If you could turn to page 7 of that document,
15 Request No. 18 states, Admit or deny that Mr. Patel did
16 not attempt to flee when Officer Dennett left the
17 patrol car and proceed toward Mr. Patel.
18          There is an objection, but you admit that he
19 did not attempt to flee, I believe, at some point in
20 time.  Is that correct?
21     A.   Yeah, I believe so.
22     Q.   Did he ever at any time attempt to flee?
23     A.   Can you define flee for me, sir?
24     Q.   Sure.  Did he ever try to run away from you?
25     A.   Run away or move away?  Can you be --

MARY DANE McCOY, CERTIFIED COURT REPORTER
LAS VEGAS, NEVADA (702)655-9900

71

1      Q.   Did he ever try to go somewhere where you
2  couldn't get to him?
3      A.   Well --
4          MS. ANDERSON:  Objection to form.
5          THE WITNESS:  That's a very vague question.
6  BY MR. COURTNEY:
7      Q.   Have you ever heard the term flee used in
8  police work?
9      A.   Yes, sir, yes, sir.
10     Q.   What does flee mean to you?
11     A.   Just to get away.
12     Q.   To get away.
13     A.   Yes.
14     Q.   Did he ever attempt to try to get away?
15     A.   According to my internal affairs transcript,
16 which we talked about, he tried to spin out of the
17 handcuffing arm lock.  That would be an indication of
18 attempting to flee.
19     Q.   And is there --
20     A.   Or could be.
21     Q.   Could be?
22     A.   Yeah, it could be.
23     Q.   Is there any other time where you believed
24 that maybe he was attempting to flee outside of the
25 time where he tried to spin away?

MARY DANE McCOY, CERTIFIED COURT REPORTER
LAS VEGAS, NEVADA (702)655-9900

72

1      A.   Not -- not outside of my direct recollection,
2  no, sir.
3      Q.   And if I could direct you to Request No. 37,
4  it's on page 13.  And it asks you to admit or deny that
5  Mr. Patel never kicked or hit you at any time.  And I
6  believe you admit that that is true; is that correct?
7      A.   That's what it says here, yes, sir.
8      Q.   So there was never a time where he attempted
9  to hit you?
10     A.   Can -- may I?
11     Q.   Yes, please.
12     A.   I know that you are asking me these very yes
13 or no questions, and my interpretation of attempt would
14 be he swung at me and missed.  But the difference
15 between being able to or taking a position where he
16 could is not necessarily an attempt, but it's
17 definitely headed that way.
18     Q.   I appreciate your clarification.  So what you
19 are saying is that there were times where you might
20 have felt like he was thinking about it, but was there
21 any time where he actually swung at you?
22     A.   No time where he actually swung at me, no,
23 sir.
24     Q.   Was there any time where he actually swung
25 his leg at you?  A kick or an attempted kick?

MARY DANE McCOY, CERTIFIED COURT REPORTER
LAS VEGAS, NEVADA (702)655-9900

# EXHIBIT "6"

# EXHIBIT "6"

**AFFIDAVIT OF CHRISTOPHER L. BLAKESLEY, ESQ.**

STATE OF NEVADA     )
                           ) SS:
COUNTY OF CLARK     )

    I, CHRISTOPHER L. BLAKESLEY, ESQ., (hereinafter "Affiant"), do hereby swear under penalty of perjury that the assertions of this Affidavit are true:

1. I make this affidavit based upon facts within my own knowledge, except as to those matters which are stated upon information and belief. I am competent to testify to the following if so called upon.

2. I am an attorney duly licensed to practice law in Nevada and a partner with the law firm Lucherini Blakesley Courtney, P.C. (the "Firm") which is counsel of record for Plaintiff in the above-captioned matter.

3. Extensive research yielded no results in with Nevada Statutes or Nevada Case Law regarding the definition of the term "submittal". For example, when entering the term "definition of submittal" or "define submittal" in Google Scholar search and/or Lexis Nexis Search, there are no results defining submittal.

4. However, "Submit" does have a legal definition. To submit is, "To end the presentation of further evidence an (a case) and tender a legal position for decision." Blacks Law Dictionary, Deluxe 8th Ed., 1999. West Group, p. 1466.

5. In this District, only three pleas are available to a defendant. They include "not guilty", "guilty", and "nolo contender". A submittal is a *substitution* for a plea, but not a plea.

6. In this District, it is custom and practice that the term "submittal" connotes a situation in which a plea is never entered. In fact, the Court agrees to dismiss the case without the defendant ever having to enter a plea or conviction. The legal theory behind the custom

1

1   and practice is that a party simply "submit" to the authority of the Court on the charge.

2   Upon submittal in this case, the Court contemporaneously dismissed all charges.

3

4   FURTHER AFFIANT SAYETH NAUGHT.

5   DATED this 5th day of May, 2017.

6

7   _____

8   CHRISTOPHER L. BLAKESLEY, ESQ.

9   SUBSCRIBED and SWORN to before me
    this 5 day of May, 2017.
10

11  _____

12  NOTARY PUBLIC

        TRAVIS HESSE
   Notary Public State of Nevada
        No. 14-13625-1
   My Appt. Exp. April 24, 20

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              2